*Ashley Hector, et al. v. Bank of New York Mellon*, No. 10, September Term, 2020. Opinion by Biran, J.

**ESTATES AND TRUSTS – TRUSTEES – INDIVIDUAL TRUSTEE LIABLITY –** The Court of Appeals held that a tort plaintiff may sue a trustee in its individual capacity for acts or omissions undertaken in the course of trust administration. Although it is well settled that an entity acting in its individual capacity, and the same entity acting as a trustee, are, in law, two distinct persons, a plaintiff may name the entity as a defendant in both capacities in a complaint. As the Restatement (Third) of Trusts § 105 (Am. Law Inst. 2012) explains, although the modern approach concerning trustee liability to third parties allows a plaintiff to assert a claim against a trustee in its representative capacity, a trustee is not insulated from also being sued in an individual capacity.

**ESTATES AND TRUSTS – TRUSTEES – INDIVIDUAL TRUSTEE LIABLITY – PERSONAL FAULT –** The Court of Appeals held that, as a matter of Maryland common law, in order to obtain a judgment against a trustee in its individual capacity for a tort committed in the course of trust administration, a plaintiff must prove that the trustee is personally at fault. The Court determined that the General Assembly did not intentionally omit this standard when it passed the Maryland Trust Act. Principles of equity, as well as the applicable provisions of the Restatement (Third) of Trusts, support the adoption of this standard for individual trustee liability.

**ESTATES AND TRUSTS – TRUSTEES – INDIVIDUAL TRUSTEE LIABILITY – PERSONAL FAULT – "STATUTE OR ORDINANCE RULE"** – The Court of Appeals held that a trustee may be personally at fault if it fails to comply with a duty imposed on it by statute or ordinance. The "Statute or Ordinance Rule" provides that, in order to make out a *prima facie* case in a negligence action, all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of. The Court declined to recognize an exception to the application of the Statute or Ordinance Rule where the defendant is a trustee. A trustee may not absolve itself of duties imposed on it by statute or ordinance by delegating those duties to a third party.

**BALTIMORE CITY HOUSING CODE – DEFINITION OF "OWNER"** – The Court of Appeals held that a purchaser of a property covered under the former Baltimore City Housing Code generally became an "owner" of the property, within the meaning of the Housing Code, upon the ratification of the foreclosure sale by the circuit court. Where, as here, the foreclosure purchaser was also the beneficiary of a deed of trust that allowed the beneficiary to obtain possession of the property prior to ratification, then the purchaser became an "owner" as of the date of the foreclosure sale. Until it purchased the property at foreclosure, the beneficiary of the deed of trust was considered a "mortgagee" and therefore exempt from the definition of "owner" under the Housing Code.

Circuit Court for Baltimore City
Case No. 24-C-16-002488
Argued: October 29, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 10

September Term, 2020

_____

ASHLEY HECTOR, ET AL.

v.

BANK OF NEW YORK MELLON

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by Biran, J.

_____

Filed: May 27, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

As young children, Petitioners Ashley Hector and Alyaa Hector (collectively, the "Hectors") lived with their parents in a rowhouse in Baltimore City that contained lead-based paint. While the Hector family lived in the home, the paint chipped in several rooms, including Ashley's and Alyaa's bedroom. Blood tests taken in January 2002 – after the Hector family had lived in the home for approximately one year – revealed that both girls had elevated levels of lead in their bodies. The Hector family moved out of the home in the spring of 2002.

The Hector family's landlord, Sharlene Epps-Smith, had taken out a mortgage on her interest in the property. That mortgage subsequently was bundled with many others and became part of, and owned by, a residential mortgage backed securitization trust. The trustee of this trust was the Bank of New York, which is now known as the Bank of New York Mellon ("BNYM"), the Respondent in this case.[1] On December 27, 2001, following Ms. Epps-Smith's default on the mortgage, BNYM as Trustee caused Ms. Epps-Smith's interest in the property to be sold at foreclosure; BNYM as Trustee was the purchaser. On February 5, 2002, the Circuit Court for Baltimore City ratified the foreclosure sale to BNYM as Trustee.

In June 2016, the Hectors (through their father) filed an Amended Complaint in the Circuit Court for Baltimore City against BNYM in its individual capacity, in which they claimed that BNYM's negligence while serving as Trustee resulted in their lead poisoning.

---

[1] For ease of reference, we refer to both the Bank of New York Mellon and to its predecessor, the Bank of New York, as "BNYM."

The Hectors alleged that they suffered severe and permanent brain damage as a result of their exposure to lead.

After discovery was concluded, the circuit court granted summary judgment to BNYM on the ground that the Hectors had erroneously named BNYM in its individual capacity, as opposed to its fiduciary (trustee) capacity. On appeal, the Court of Special Appeals held that BNYM could theoretically be liable in its individual capacity for a tort it committed while serving as the Trustee. Although the intermediate appellate court thus disagreed with the circuit court's reason for ruling against the Hectors, it affirmed the circuit court's judgment on another ground: that the Hectors had failed to produce facts from which the trier of fact could conclude that BNYM was personally at fault for the failure to properly maintain the property. The Hectors petitioned this Court for further review.

We agree with the Court of Special Appeals that (1) a trustee may be held individually liable for a tort committed in the course of trust administration, if (2) the trustee is personally at fault. We affirm the Court of Special Appeals on these points. However, contrary to the Court of Special Appeals, we conclude that the Hectors satisfied their burden at summary judgment as to BNYM's personal fault by producing facts from which a jury could find that BNYM breached a duty it owed to the Hectors under the Baltimore City Housing Code as the "owner" of the property. Thus, we will reverse the judgment of the Court of Special Appeals and remand this case to the circuit court for further proceedings.

# I

## Background

### A. Facts

A review of the evidence in the summary judgment record in the light most favorable to the Hectors reveals the following facts:

1. Ms. Epps-Smith's Interest in 447 North Linwood Avenue

On September 30, 1999, Intercoastal Investment Trust ("Intercoastal") purchased a two-story rowhouse located at 447 North Linwood Avenue in Baltimore City (the "Property") for $15,000. That same day, Sharlene Epps-Smith[2] entered into a 99-year lease agreement with Intercoastal, whereby Ms. Epps-Smith agreed to pay Intercoastal a lump sum of $60,000 and to make an annual rent payment of $96.00.[3] In addition, on the same date, Ms. Epps-Smith executed a Purchase Money Deed of Trust for $54,000 secured by her interest in the Property. The original beneficiary of this deed of trust was First Equity Mortgage, Inc., which was defined in the document as "Lender." Among other provisions, the deed of trust stated that Ms. Epps-Smith, as the "Borrower," "shall have possession of the Property until Lender has given Borrower notice of default[.]"

---

[2] Sharlene Epps-Smith is also referred to as "Sharlene Epps" and "Sharlene Smith" at various points in the record. We will refer to her as Ms. "Epps-Smith," which is how her name appears in the Hectors' Second Amended Complaint.

[3] The agreement between Intercoastal and Ms. Epps-Smith was a lease for ground rent. As we have previously explained, "[t]he ground lease is a centuries-old home financing tool found almost exclusively in Maryland." *State v. Goldberg*, 437 Md. 191, 196 (2014).

The rowhouse at 447 North Linwood Avenue was built in 1900 and contained lead-based paint.

2. The Securitization of Ms. Epps-Smith's Mortgage

On December 1, 1999, BNYM as Trustee, together with CWMBS, Inc. ("CWMBS") and Indymac, Inc. ("Indymac"), created a special purpose vehicle in the form of a trust, known as Residential Asset Securitization Trust 1999-A9 Mortgage Pass-Through Certificates, Series 1999-I (the "Trust"). This kind of trust (often called a residential mortgage backed securitization trust) serves as a repository for loans and to hold mortgage collateral and other contract rights for its owners, who are the certificateholders and who hold a beneficial interest in the trust. At the time the Trust was created, BNYM as Trustee executed a Pooling and Servicing Agreement ("PSA") establishing and governing the rights and responsibilities of the parties in the administration of the Trust. The other parties to the PSA were CWMBS as the "Depositor" and Indymac as the "Seller" and "Master Servicer." Among other things, the PSA set forth the scope of BNYM's duties as Trustee, as well as its liabilities to the Trust.

Along with many other mortgage instruments, Ms. Epps-Smith's mortgage on her leasehold interest in the Property became a part of, and owned by, the Trust.

3. Ms. Epps-Smith's Default on the Mortgage and the Foreclosure Proceedings

Ms. Epps-Smith quickly defaulted on her mortgage, only paying a total of $348.30. In November 2001, BNYM as Trustee caused a foreclosure action to be filed in the Circuit Court for Baltimore City. On November 21, 2001, BNYM as Trustee appointed the substitute trustees to initiate the foreclosure action and conduct the sale. The substitute

4

trustees filed the papers docketing the foreclosure action in the Circuit Court on November 26, 2001. An auction went forward on December 27, 2001, at which time BNYM as Trustee purchased Ms. Epps-Smith's leasehold interest in the Property. A judge of the Circuit Court signed an order ratifying the sale on February 5, 2002.

BNYM as Trustee filed a motion for possession with respect to the Property on March 11, 2002. The circuit court granted the motion for possession on August 15, 2002.

A deed conveying the leasehold interest in the Property to BNYM as Trustee was recorded in Baltimore City's land records on May 23, 2003.

4. <u>The Hector Family's Rental of the Property and the Hectors' Exposure to Lead-Based Paint</u>

The Hector family rented the Property as tenants of Ms. Epps-Smith beginning in late 2000 or early 2001, and ending at some point in the spring of 2002. The family included Ashley and Alyaa, twin sisters born in September 1997, and their parents, Lamont and Danielle Hector. Mr. and Mrs. Hector interacted primarily with Daniel Smith, the brother of Ms. Epps-Smith, regarding the upkeep of the Property.

Prior to the Hectors moving into the Property, Mr. Smith painted the interior of the house. Within approximately a month or two of moving in, Mr. and Mrs. Hector noticed paint chipping on the walls in the children's bedroom, kitchen, and master bedroom. After they complained about the chipping paint, Mr. Smith repainted.

Three to four months later, Mr. and Mrs. Hector noticed the paint chipping again and alerted Mr. Smith to the problem. However, Mr. Smith did not repaint again. In response, the Hectors withheld rent. Mr. Smith filed a landlord/tenant action in the summer

5

of 2001 for unpaid rent, but failed to appear for court. However, according to Mr. Hector, a representative of the bank "that foreclosed on the Property" attended the court proceeding. That representative, who Mr. Hector thought was from "New York Bank," informed Mr. Hector of the foreclosure proceedings and said that Mr. Smith should not be attempting to rent out the Property or to collect rent. On another occasion, a different representative of "the bank" came to the Property and informed Mr. Hector that: (1) the bank "actually owned the [P]roperty"; (2) the "house was foreclosed on"; (3) no one was supposed to be in the Property; (4) the bank had tried to turn the water off but could not do so because the Property was occupied; and (5) the bank was going to file for an eviction.

Blood tests taken on Ashley and Alyaa Hector on January 7, 2002, revealed that both children had elevated lead levels. The Hectors' test results prompted an inspection by the Baltimore City Health Department on or about March 7, 2002, which led to the issuance of a violation notice to Ms. Epps-Smith on March 13, 2002, and an emergency violation notice and order on April 2, 2002 to Mr. Smith to remove the "lead nuisance" from the property. The Hectors voluntarily vacated the Property in the spring of 2002.

## B. The Hectors' Lawsuit

### 1. Complaint

On April 27, 2016, the Hectors (through their father) filed a Complaint against Ms. Epps-Smith and Mr. Smith in the Circuit Court for Baltimore City, seeking damages for injuries related to lead-paint poisoning. On June 10, 2016, the Hectors filed an Amended Complaint adding BNYM as a defendant. The Amended Complaint consisted of three counts, each for negligence against one of the named defendants, alleging severe and

permanent brain damage as a result of lead poisoning. With respect to BNYM in Count III, the Hectors alleged, among other things:

> For that all [sic] of the time mentioned herein the Defendant, [BNYM], owned and/or controlled, either individually or by the use of agents, apparent agents, servants and/or employees, a lot of ground and building known as [the Property] . . . which [BNYM] either individually or by agents, apparent agents, servants or employees, had a duty to manage, supervise, and maintain pursuant to the Baltimore City Code. [BNYM], as trustee under a Pooling and Servicing Agreement, pursuant to a foreclosure, did purchase [the Property] at auction on December 27, 2001.

On September 19, 2016, BNYM filed an Answer to the Amended Complaint. In its Answer, BNYM generally denied liability, and specifically asserted that it "ha[d] no personal liability for [the Hectors'] claims." The parties then engaged in discovery.

2.      Motion for Summary Judgment

On May 21, 2018, BNYM moved for summary judgment. In relevant part, BNYM argued that it was not an owner or holder of legal title, or a vendee in possession of the Property, prior to the date the Hectors vacated the Property, and could not be an owner of the Property because it was acting in an administrative capacity and did not have control over the Property sufficient to be charged with a duty to maintain it. BNYM further asserted that the Hectors sued BNYM improperly in its individual capacity, when the appropriate capacity was as a trustee.

The Hectors opposed the motion for summary judgment, arguing that BNYM was an "owner" of the Property during the relevant period under the plain language of the Baltimore City Housing Code. *See* Balt. City Code (2000 Repl. Vol.), Art. 13, §§ 103(b) and 105(jj) (the "Housing Code" or the "Code"). In addition, the Hectors asserted that the

7

Maryland Trust Act, Md. Code, Est. & Trusts ("ET") § 14.5-908(b) (2017 Repl. Vol.) (sometimes referred to herein as the "Trust Act" or the "Act"), permits a tort claim against a trustee in the trustee's individual capacity.

On July 11, 2018, the circuit court held a hearing on the motion for summary judgment. The Hectors' counsel confirmed during his presentation that the Hectors sued BNYM in its individual capacity, not in its capacity as a trustee. Ruling from the bench, Judge Barry G. Williams granted summary judgment in favor of BNYM on the ground that the Hectors had failed to sue the appropriate party:

> But at a very base level, what the Plaintiff has done here is sued the Bank of New York Mellon. All through the papers, there's the issue of the Bank of New York Mellon, whether there's a trustee. And I assumed that at some point there would either have been an amendment to the complaint or that there would be an issue with Defense and Plaintiff agreeing. I do not have that.
>
> For those reasons, the Court will find, based on summary judgment that there's no dispute as to any material fact, whether a party is entitled to judgment as a matter of law, that the Bank of New York Mellon is not the trustee, that the Bank of New York Mellon as presented by Counsel for Plaintiff is not the appropriate party to be sued, and the motion for summary judgment is granted on that point.

Over BNYM's objection, Judge Williams granted the Hectors' oral motion for leave to amend the first Amended Complaint.

3.      The Second Amended Complaint and BNYM's Motion to Strike or Dismiss

On July 24, 2018, the Hectors filed a Second Amended Complaint. In the caption, the Hectors named BNYM as a defendant "Individually, and as Trustee." The Second Amended Complaint again also named Ms. Epps-Smith and Mr. Smith as co-defendants.

8

On August 10, 2018, BNYM filed a motion to strike and/or dismiss the Second Amended Complaint. BNYM argued that BNYM in its individual capacity was not a proper party, as Judge Williams had previously ruled on summary judgment. On October 3, 2018, the circuit court held a hearing on BNYM's motion. In his presentation, the Hectors' counsel noted that the Trust no longer was in existence. Thus, it was clear that, for the Hectors to receive any recovery from BNYM, there would need to be a finding of individual liability on the part of BNYM. The parties agreed that the only issue before the circuit court was whether the Hectors had properly named BNYM as a defendant in the Second Amended Complaint in its individual capacity.

In an oral ruling, Judge John S. Nugent granted the motion to dismiss:

> It is this Court [sic] position that that matter has already been decided, clearly decided, by Judge Williams. He granted summary judgment on behalf of Defendant Bank of New York Mellon in their individual capacity. This Court sees no reason to reconsider or to interfere with the order of Judge Williams. Therefore the motion will be granted as to the Bank in its individual capacity.

Following Judge Nugent's ruling, the Hectors filed a Stipulation of Dismissal with Prejudice with respect to their claims against Ms. Epps-Smith and Mr. Smith. The Hectors then noted a timely appeal.

4.      Appeal

The Court of Special Appeals affirmed the judgment of the circuit court, but for different reasons. *Hector v. Bank of New York Mellon*, 244 Md. App. 322 (2020). The intermediate appellate court relied on the Restatement (Third) of Trusts for the proposition that the Hectors could sue BNYM in its individual capacity for a tort it allegedly committed while serving as the Trustee of the Trust. *Id.* at 332. Thus, the court disagreed with the

9

circuit court's reasoning for dismissing the Second Amended Complaint as to BNYM. *See id.* However, interpreting Judge Nugent's dismissal of the Second Amended Complaint as "effectively affirming the initial grant of summary judgment," *id.* at 325, the Court of Special Appeals considered whether BNYM was entitled to summary judgment on another ground.

Although the court stated that BNYM as Trustee was an "owner" of the Property under the Housing Code during the relevant period, *id.* at 338, the court held that, in order to survive summary judgment, the Hectors had to produce facts sufficient to generate a dispute as to whether BNYM was "personally at fault" for the alleged tort. *Id.* at 332-33. The intermediate appellate court relied on this Court's opinion in *Allen v. Dackman*, 413 Md. 132 (2010), in concluding that, in order to be personally at fault, BNYM must have "personally committed, inspired, or participated" in the alleged tort. *Id.* at 341 (quoting *Dackman*, 413 Md. at 141).

The court then discussed an affidavit attached to BNYM's summary judgment motion from Phillip R. Burnaman, II, an expert in mortgage-backed securitization transactions. Mr. Burnaman explained that the PSA called for the Master Servicer (Indymac), not the Trustee (BNYM), to make decisions concerning foreclosures and other actions the Trust might take with respect to properties secured by the mortgages in the Trust. Thus, according to Mr. Burnaman (as recounted by the court), "[i]t is clear here … that the securitization trustee was not the owner of the mortgage loans or the … property, did not act like an owner of the … property and was not consulted by the servicer when and as the servicer made a series of decisions regarding the loan foreclosure, the …

10

property and appropriate loss mitigation alternatives." *Id.* at 339. To the contrary, Mr. Burnaman opined that "BNYM as Trustee's only involvement with trust property was passive, and that it was not engaged in the active real estate business." *Id.* (internal quotation marks omitted).

The Court of Special Appeals held that the Hectors had not sufficiently contradicted Mr. Burnaman's affidavit concerning BNYM's "passive" role as to the Property. *Id.* at 341-42. Having concluded that the Hectors did not produce facts sufficient to show that BNYM was personally at fault, the intermediate appellate court affirmed the circuit court's judgment in favor of BNYM. *Id.* at 342.

On March 16, 2020, the Hectors filed a petition for a writ of *certiorari*. On May 8, 2020, we granted the Hectors' petition. 468 Md. 544 (2020). We have rephrased the Hectors' questions presented into the following two questions:

I.     Did the circuit court err in dismissing the Second Amended Complaint as to BNYM in its individual capacity?

II.    Is BNYM entitled to summary judgment either because it was not personally at fault for the negligence that allegedly harmed the Hectors, or because it was not an "owner" of the Property, within the meaning of the Housing Code, while the Hectors lived there?

**II**

**Standard of Review**

"The standard for appellate review of a trial court's grant of a motion for summary judgment is simply whether the trial court was legally correct ... and is subject to no deference." *Hamilton v. Kirson*, 439 Md. 501, 522 (2014) (internal quotation marks and citations omitted). *Id.* Thus, we conduct an independent review of the record to determine

11

whether the parties generated a dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law. *Id*. We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts in the record against the moving party. *See id.*

**III**

**<u>Discussion</u>**

### A. BNYM May Be Individually Liable for a Tort It Allegedly Committed in Its Capacity as Trustee.

We first consider the circuit court's dismissal of the Second Amended Complaint on the ground that the Hectors may not seek to hold BNYM liable in its individual capacity for acts and omissions BNYM allegedly committed in its capacity as Trustee. The Court of Special Appeals disagreed with the circuit court's reasoning for granting judgment to BNYM, holding that BNYM, at least in theory, "could be held individually liable for actions it took in its representative capacity as trustee." *Hector*, 244 Md. App. at 332. We agree.

At common law, neither a trust nor a trustee in its representative capacity could sue or be sued. *See Doermer v. Oxford Fin. Grp.*, 884 F.3d 643, 647 (7th Cir. 2018); *see also Richardson v. Klaesson*, 210 F.3d 811, 813 (8th Cir. 2000) (explaining that, at common law, a trust estate "was not a juridical entity … and the trustee, *qua* trustee, was not a juristic person."). That being the case, under the traditional approach concerning trustee liability to third parties that developed at common law, a trustee was "personally liable for torts committed by the trustee or the trustee's agents or employees, without regard to

12

whether the trustee [was] personally at fault." Restatement (Third) of Trusts, Introductory Note to ch. 21, at 94 (Am. Law Inst. 2012). However, the trustee was entitled to indemnification from the trust estate if the trustee acted properly. *Id.*

Over the past several decades, this traditional approach has fallen out of favor. The Third Restatement of Trusts explains:

> Commentators have long criticized the traditional approach as unfair to trustees whenever the trust estate is insufficient to provide full indemnity, and perhaps to third parties if the trustee's own assets are insufficient to satisfy all of the trustee's debts.... Reacting to these concerns, most American states ... no longer follow the traditional rules. Under the modern approach adopted in this Chapter, third parties may proceed against a trustee in the trustee's fiduciary ("representative") capacity whether or not the trustee is also personally liable, with the trustee shielded from personal liability insofar as the trustee acted properly.

*Id.* Indeed, under the Maryland Trust Act, "[a] claim based on a contract entered into by a trustee in the fiduciary capacity of the trustee, on an obligation arising from ownership or control of trust property, or on a tort committed in the course of administering a trust, may be asserted in a judicial proceeding against the trustee in the fiduciary capacity of the trustee, regardless of whether the trustee is personally liable for the claim." ET § 14.5-908(b); *see also* Restatement (Third) of Trusts § 105 ("A third party may assert a claim against a trust for a liability incurred in trust administration by proceeding against a trustee in the trustee's representative capacity, whether or not the trustee is personally liable.").

Although the modern approach thus allows a third party to assert a claim against a trust by proceeding against a trustee in its representative capacity, the rule stated in § 105 of the Third Restatement of Trusts "does not insulate a trustee from also being sued in an individual capacity.... Plaintiffs may sue trustees in both individual and representative

13

capacities, it frequently being unclear at the outset of litigation whether the facts will give rise to representative or individual liability." *Id.* cmt. c; *see also id.* cmt. a ("This Section does not preclude a third party from proceeding against a trustee in both the trustee's individual and representative capacities; in fact, this is frequently done."). Indeed, the phrase "whether the trustee is personally liable for the claim" in ET § 14.5-908(b) suggests that, in some cases, a trustee will be individually liable for a tort it commits in the course of trust administration.

Here, in the caption of the operative complaint (the Second Amended Complaint), the Hectors named BNYM in both its individual and trust capacities. BNYM argues that the circuit court correctly dismissed the complaint as to BNYM in its individual capacity because "[t]here is no evidence that BNYM in its individual capacity had any involvement with the Property outside of its management of Trust assets pursuant to the terms of the PSA." BNYM may be correct that it acted in connection with the Property only in its trustee capacity, but it does not follow from this premise that BNYM can only be liable in its trustee capacity for a tort it committed in the course of administering the Trust.

Although it is well settled that an entity acting in its individual capacity, and the same entity acting as a trustee, "are, in law, two entirely separate and distinct persons," *Alexander v. Rose*, 181 Md. 447, 454 (1943), a plaintiff may name the entity as a defendant in both capacities in a complaint. *See, e.g.*, *Snyder v. U.S. Bank N.A.*, 387 F. Supp.3d 867, 871-72 (N.D. Ill. 2019) (plaintiffs alleged that bank defendants were liable both in their capacities as trustees and "in their individual capacities in relation to their own acts and omissions"; court denied defendants' motion for judgment on the pleadings with respect to

14

claims against them in their individual capacities); *Colorado Springs Cablevision, Inc. v. Lively*, 579 F. Supp. 252, 255-56 & nn.6-7 (D. Colo. 1984) ("Even if Lively was being sued solely in his individual capacity, the complaint should not be dismissed. It is a generally accepted rule that a trustee may be personally liable to third parties for obligations incurred during the administration of a trust. These obligations may arise out of torts committed by the trustee ... or as a result of owning property held in trust"; although "in Colorado a trustee will only be personally liable if he is 'personally at fault' ... [,] [e]ven if this provision were applicable, dismissal of the action at this stage would be inappropriate, for fault is a factual issue."); *In re Schneider*, 417 B.R. 907, 914 (Bankr. N.D. Ill. 2009) ("Referencing Sarah in the Complaint in her alternative capacities with respect to the fraudulent transfer claim does not necessarily mean that the [plaintiff] sued the wrong party on that claim."); *People v. Braum*, 263 Cal. Rptr. 3d 1, 18-19 (Cal. Ct. App. 2020) (defendant held personally liable for civil penalties after having been sued in both his individual capacity and trustee capacity).[4]

Because BNYM may be individually liable for acts or omissions it committed in its capacity as a trustee, the Hectors were permitted to sue BNYM in its individual capacity.

---

[4] As a matter of pleading, under Maryland Rule 2-304(a), "[i]t is not necessary to aver ... the authority of a party to sue or be sued in a representative capacity." Here, however, in response to Judge Williams's ruling, the Hectors specified in the Second Amended Complaint that they were proceeding against BNYM in both its individual and trustee capacities. We gather that, on remand, the Hectors will only ask the jury to award damages against BNYM in its individual capacity, as the Trust no longer exists. As discussed below, to obtain a judgment against BNYM in its individual capacity, the Hectors will need to prove at trial that BNYM was personally at fault.

15

It follows that the circuit court erred in dismissing the Second Amended Complaint on the ground that the Hectors improperly named BNYM as a defendant in its individual capacity.

### B. BNYM Is Not Entitled to Summary Judgment on Other Grounds.

Although the Court of Special Appeals held that the circuit court's reason for granting judgment to BNYM was incorrect, the intermediate appellate court affirmed the judgment on another ground. Specifically, the Court of Special Appeals held that the Hectors failed to produce facts at the summary judgment stage sufficient to generate a dispute as to whether BNYM as Trustee was "personally at fault" for the alleged tort. *Id.* at 332-33. BNYM argues that this holding of the Court of Special Appeals is correct.[5] In addition, BNYM asserts that it is also entitled to summary judgment for another reason. It contends that, even if a trustee can be personally liable for a tort by virtue of its ownership of a dwelling that is subject to the Housing Code, it is undisputed that BNYM did not become an "owner" of the Property until after the Hectors moved out.

---

[5] We take note of the unusual posture of this case. Although the circuit court granted BNYM's motion for summary judgment, the court permitted the Hectors to amend their complaint. After the Hectors did so, BNYM filed its motion to dismiss or strike, which the circuit court granted. As a technical matter, it is that order of dismissal from which the Hectors appealed. However, in the Court of Special Appeals, the Hectors framed the question for which it sought review as whether the circuit court "err[ed] in granting summary judgment by finding as a matter of law, that ... BNYM, as Trustee ... had no individual duty to minor children residing in an old dangerous rental property in Baltimore City, where BNYM defaulted the debtor, foreclosed on the property, and purchased the dwelling at auction." As the Court of Special Appeals observed, Judge Nugent granted the motion to dismiss because Judge Williams previously had granted summary judgment to BNYM on the same ground. Thus, the intermediate appellate court viewed Judge Nugent's ruling as "effectively affirming the initial grant of summary judgment," *Hector*, 244 Md. App. at 325, and accepted the Hectors' invitation to review whether BNYM was entitled to summary judgment. We shall do the same. *See also* note 6 below.

16

According to the Hectors, to withstand BNYM's motion for summary judgment, they were required only to show that sufficient facts exist for a jury to conclude that BNYM breached a duty the Housing Code imposed upon it as an "owner" of the Property. The Hectors further contend that BNYM became an "owner" of the Property prior to the date they moved out in the spring of 2002. We agree with the Hectors.[6]

1.  A Trustee "Owner" of Property Covered under the Housing Code May Be Individually Liable for Harm Suffered by an Occupant If the Trustee Fails to Comply with an Owner's Duties Under the Code.

    a.  *Pertinent Provisions of the Housing Code*

To understand the scope of a trustee's individual liability for alleged torts involving the failure to maintain properties in Baltimore City, it is helpful to begin by discussing

---

[6] Although BNYM raised these alternate grounds for summary judgment in the circuit court, Judge Williams did not address them. As we recently explained in *State v. Rovin*, No. 29, Sept. Term 2020, slip op. at 54 (Md. March 2, 2021), "[w]e must be cognizant of the general rule that in appeals from the granting of a motion for summary judgment, absent exceptional circumstances, Maryland appellate courts will only consider the grounds upon which the lower court granted summary judgment." (Internal quotation marks and citation omitted). However, "because this is a general rule rather than an absolute one, there are exceptions." *Id.* For example, "an appellate court may affirm on a different ground where the trial court would have had no discretion to deny summary judgment as to that ground." *Id.* This exception applies to BNYM's argument that it is entitled to judgment as a matter of law because it did not become an "owner" of the Property until after the Hectors moved out. If BNYM is correct about that, Judge Williams would have lacked discretion to deny summary judgment, had he believed he needed to reach that alternate ground. As for the Court of Special Appeals' holding that the Hectors failed to produce facts showing that BNYM as Trustee was "personally at fault," another exception to the general rule applies. As we stated in *Rovin*, "an appellate court may affirm on a different ground where the two grounds are so interrelated that they cannot be properly considered as separate and distinct." *Id.* at 54-55. (cleaned up). The questions of whether a trustee may be sued in its individual capacity for a tort committed in the course of trust administration and, if so, what the plaintiff must prove to establish individual liability, are sufficiently interrelated to warrant our reaching the latter question, despite the fact that Judge Williams did not do so.

17

several pertinent provisions of the Housing Code.[7] The Housing Code is "liberally construed" to effectuate its "remedial" purposes that are "essential to the public interest." Housing Code § 103(b). Those remedial purposes, among others, are to:

> (1) establish and maintain basic minimum requirements, standards, and conditions essential for the protection of the health, safety, morals, and general welfare of the public and of the owners and occupants of dwellings in the City of Baltimore;
>
> (2) establish minimum standards governing the condition, use, operation, occupancy, and maintenance of dwellings and other structures, and the utilities, facilities, and other physical components, things, and conditions to be supplied to dwellings in order to make dwellings safe, sanitary, and fit for human habitation; [and]
>
> (3) fix certain responsibilities and duties of owners, operators, agents, and occupants of dwellings[.]

*Id.* § 103(a). Under the Housing Code, "[a]ny person who is either an owner or operator of a property subject to this Code shall be responsible for compliance with all of the provisions of the Code." *Id.* § 310(a).

---

[7] When we refer to the Housing Code in this opinion, we mean the Housing Code as it existed during the time when the Hectors resided at the Property: late 2000/early 2001 through the spring of 2002. In December 2002, the Baltimore City Council repealed Division V of Article 13 of the Baltimore City Code, which comprised the Housing Code. The City Council subsequently enacted the Building, Fire, and Related Codes of Baltimore City, which currently incorporates the 2018 edition of the "International Property Maintenance Code" published by the International Code Council, Inc., as supplemented, amended, or otherwise modified by the Mayor and City Council of Baltimore. The International Property Maintenance Code addresses many of the topics that were covered in the Housing Code. *See* Baltimore City Department of Legislative Reference, Building, Fire, and Related Codes of Baltimore City (2020), available at https://ca.baltimorecity.gov/codes/Art%2000%20-%20Bldg,%20Fire.pdf [https://perma.cc/EB5D-B56U].

Section 702 of the Housing Code requires that "[e]very building ... occupied as a dwelling shall, while in use ..., be kept in good repair, in safe condition, and fit for human habitation." Under § 703, "good repair and safe condition shall include but is not limited to the following standards ... [a]ll walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose, or peeling paint."

Under the Housing Code, an "owner" is

(1) any person, firm, corporation, guardian, conservator, receiver, trustee, executor, or other judicial officer, who, alone or jointly or severally with others, owns, holds, or controls the whole or any part of the freehold or leasehold title to any dwelling or dwelling unit, with or without accompanying actual possession thereof; and

(2) shall include in addition to the holder of legal title, any vendee in possession thereof, but shall not include a mortgagee or an owner of a reversionary interest under a ground rent lease.

*Id.* § 105(jj).

We have held that the term "owner" in the Housing Code has "a broader meaning than it does in the traditional sense," reaching "not only ... those who actually own the title to a dwelling, but also those who 'hold[ ] or control[ ]' that title as well." *Allen v. Dackman*, 413 Md. at 148 (quoting Housing Code § 105(jj)). To ascertain whether someone other than the actual title owner is deemed to be an "owner" under the Code, "the relevant determination ... is whether [the person] had an ability to change or affect the title to the property at issue." *Id.* at 149 (cleaned up). We explained in *Dackman* that "the ability to buy and sell the property ... is an example of controlling the title to a dwelling." *Id.* at 150 n.13.

19

### b. The "Statute or Ordinance Rule"

The Hectors base their argument for reversal of summary judgment on the "Statute or Ordinance Rule." At common law and in the absence of a statute, "a landlord ordinarily has no duty to keep rental premises in repair, or to inspect the rental premises either at the inception of the lease or during the lease term." *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 78 (2003), *abrogated on other grounds by Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594 (2011). However, "where there is an applicable statutory scheme designed to protect a class of persons which includes the plaintiff, another well-settled Maryland common law rule has long been applied by this Court in negligence actions. That rule states that the defendant's duty ordinarily is prescribed by the statute or ordinance and that the violation of the statute or ordinance is itself evidence of negligence." *Id.* (internal quotation marks and citation omitted). Thus, "in order to make out a *prima facie* case in a negligence action, all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Id.* at 79. We have referred to this two-part test as the "Statute or Ordinance Rule." *See Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 111 n.6 (2014); *Polakoff v. Turner*, 385 Md. 467, 476 (2005).

In *Brooks*, we explained that, "[w]here there is evidence that the violation of the statute proximately caused the plaintiff's injury, evidence of such violation is sufficient evidence to warrant the court in submitting the case to the jury on the question of the defendant's negligence." *Brooks*, 378 Md. at 79 (cleaned up). The jury "must then evaluate whether the actions taken by the defendant were reasonable under all the circumstances."

20

*Id.* We stressed that the case law explicating the Statute or Ordinance Rule does not "impose[] upon the plaintiff the additional burden of proving that the defendant was aware that he or she was violating the statute or ordinance." *Id.* at 80. Rather, "[i]t is the violation of the statute or ordinance alone which is evidence of negligence." *Id.*

In *Brooks*, this Court examined the application of the Statute or Ordinance Rule in the context of a Baltimore City lead paint case. There, a child allegedly suffered lead poisoning as a result of consumption of lead-based paint, which was present in the form of flaking, loose, and peeling paint in the leased premises. *Id.* at 72-74. The plaintiffs alleged in count one of their complaint that the defendants were negligent in allowing these conditions to exist within the premises, and that their negligence caused the child's elevated blood lead level. *See id.*

We observed that the Housing Code "imposes numerous duties and obligations upon landlords who rent residential property to tenants," *id.* at 81, and quoted this Court's prior opinion in *Brown v. Dermer*, 357 Md. 344, 367 (2000), for the proposition that "by enacting §§ 702 and 703 of the Housing Code, the City Council sought to protect children from lead paint poisoning by putting landlords on notice of conditions which could enhance the risk of such injuries." *Id.* Thus, we held that, under the Statute or Ordinance Rule, "if the plaintiffs can establish a violation of the Housing Code which proximately caused [the child's] injuries, then the plaintiffs are entitled to have count one of their complaint submitted to the trier of facts … [because] the plaintiffs need not prove that Lewin Realty had notice of the Housing Code violation." *Id.* at 81.

21

### c. *Should We Recognize a "Trustee Exception" to the Statute or Ordinance Rule?*

BNYM does not dispute that, at some point while serving in its trustee capacity, it became an "owner" of the Property within the meaning of the Housing Code. The parties disagree on the point in time when BNYM became an "owner."[8] However, BNYM asserts that, even if it was an "owner" during the time the Hector family occupied the Property, it cannot be individually liable for any injuries the Hectors allegedly suffered as a result of exposure to lead paint during BNYM's period of ownership. BNYM contends that, when the owner of a property is a trustee, a plaintiff must do more than show a violation of the Housing Code and proximate causation to have its claim of negligence against the trustee in its individual capacity go to a jury. According to BNYM, (1) a plaintiff must produce facts from which the jury could find that the trustee owner was "personally at fault" for the tort; and (2) to show that the trustee was "personally at fault," the plaintiff must prove that the trustee "personally committed, inspired, or participated" in the tort. In making this argument, BNYM effectively asks us to recognize an exception to the Statute or Ordinance Rule for trustee defendants. For the reasons discussed below, we decline to do so.

### i. *The "Personally at Fault" Standard for Individual Trustee Liability to Third Parties*

We do agree, however, with BNYM's preliminary contention: a trustee may be held individually liable for a tort committed as part of the administration of the trust only if the trustee is personally at fault.

---

[8] We address that question in Section B.2 below.

In 2014, the General Assembly enacted the Maryland Trust Act as Title 14.5 of the Estates and Trusts Article. 2014 Md. Laws ch. 585. The Trust Act is "a modified version of the Uniform Trust Code [("UTC")] drafted by the National Conference of Commissioners on Uniform State Laws." Senate Judicial Proceedings Committee, Floor Report, Senate Bill 240 (2014). The Act "provides a more comprehensive codification of the law of trusts within the Maryland Code. It partially codifies the existing law in Maryland governing trusts, but also contains modifications and additions to existing law." *Id.*

Relevant to this case, the Trust Act, ET § 14.5-908, provides:

(a) Except as otherwise provided in the contract, a trustee is not personally liable on a contract properly entered into by the trustee in the fiduciary capacity of the trustee in the course of administering the trust if the trustee in the contract disclosed the fiduciary capacity.

(b) A claim based on a contract entered into by a trustee in the fiduciary capacity of the trustee, on an obligation arising from ownership or control of trust property, or on a tort committed in the course of administering a trust, may be asserted in a judicial proceeding against the trustee in the fiduciary capacity of the trustee, regardless of whether the trustee is personally liable for the claim.

As the Court of Special Appeals noted, prior to this case, no appellate court had interpreted § 14.5-908. *Hector*, 244 Md. App. at 331.

Section 14.5-908 is the codification, in part, of UTC § 1010. UTC § 1010 provides:

(a) Except as otherwise provided in the contract, a trustee is not personally liable on a contract properly entered into in the trustee's fiduciary capacity in the course of administering the trust if the trustee in the contract disclosed the fiduciary capacity.

23

(b) A trustee is personally liable for torts committed in the course of administering a trust, or for obligations arising from ownership or control of trust property, including liability for violation of environmental law, only if the trustee is personally at fault.

(c) A claim based on a contract entered into by a trustee in the trustee's fiduciary capacity, on an obligation arising from ownership or control of trust property, or on a tort committed in the course of administering a trust, may be asserted in a judicial proceeding against the trustee in the trustee's fiduciary capacity, whether or not the trustee is personally liable for the claim.

As is apparent from a comparison of the two texts, ET § 14.5-908 codifies subsections (a) and (c) of UTC § 1010, but not subsection (b). Despite omission of UTC § 1010(b) from ET § 14.5-908, BNYM argues that this Court should now adopt and incorporate the substance of UTC § 1010(b) as part of Maryland common law. We agree.

As discussed in Part A above, under the "traditional" approach concerning trustee liability to third parties, a trustee was personally liable for torts committed by the trustee or the trustee's agents or employees, without regard to whether the trustee was personally at fault. However, "a trustee who was not at fault was entitled to indemnity from the trust estate." 4 Austin W. Scott, William F. Fratcher & Mark L. Ascher, *Scott and Ascher on Trusts* § 26.3 (4th ed. 2007) (footnote omitted). Thus, if the trustee was not at fault and "if the trustee discharged the liability with the trustee's own funds, the trustee was entitled to reimbursement. Alternatively, the trustee could properly use trust funds to discharge the liability directly. The result was that, although the trustee was liable for the tort in the first instance, ordinarily the liability ultimately fell on the trust estate." *Id.*

As discussed above, commentators criticized this traditional approach because it was "unfair to trustees whenever the trust estate is insufficient to provide full indemnity

24

and perhaps to third parties if the trustee's own assets are insufficient to satisfy all of the trustee's debts." Restatement (Third) of Trusts, Introductory Note to ch. 21, at 94. The modern approach to trustee liability, as reflected in § 105 of the Third Restatement of Trusts, addresses this perceived unfairness by allowing plaintiffs to sue trustees in their fiduciary capacities and thereby reach trust assets directly. Section 106 of the Restatement (similar to UTC § 1010(b)) "states a related substantive rule: in appropriate circumstances, the trustee is insulated from personal liability[.]" *Id.* cmt. a. Specifically, § 106 provides in pertinent part: "A trustee is personally liable ... for a tort committed in the course of trust administration, or for an obligation arising from the trustee's ownership or control of property, only if the trustee is personally at fault." Restatement (Third) of Trusts § 106(2). Read together, §§ 105 and 106 of the Third Restatement demonstrate that a plaintiff may seek to recover against a trustee in its individual capacity for acts and omissions the trustee committed in the course of administering the trust, but the individual liability of a trustee is limited substantively to instances in which the trustee is personally at fault for the harm proven by the plaintiff.

As part of its adoption of the Trust Act, the General Assembly explicitly embraced part of the modern approach in this area of the law of trusts, providing that "[a] claim based on a contract entered into by a trustee in the fiduciary capacity of the trustee, on an obligation arising from ownership or control of trust property, or on a tort committed in the course of administering a trust, may be asserted in a judicial proceeding against the trustee in the fiduciary capacity of the trustee, regardless of whether the trustee is personally liable for the claim." ET § 14.5-908(b). Thus, plaintiffs may now effectively sue a trust for a tort

25

committed in the course of trust administration in Maryland by proceeding against the trustee in its fiduciary capacity, even if the trustee is personally at fault for the tort. If the plaintiff obtains a judgment against the trustee in its fiduciary capacity, the trust will be responsible to pay the judgment. If the trustee is personally at fault, the trust beneficiaries may seek indemnification or another remedy from the trustee.

Nevertheless, as discussed above, a tort plaintiff remains able to sue the trustee in its individual capacity. Thus, the pertinent question here is whether, following the enactment of ET § 14.5-908(b), a plaintiff may still recover from a trustee in its individual capacity where the trustee is not personally at fault. We answer that question in the negative.

The traditional approach contemplated that, in a case where a trust had assets to pay a judgment obtained against a trustee, the trust would indemnify the trustee if the trustee was not personally at fault. Thus, under the traditional approach, the trustee would be responsible to pay a judgment if the trustee was personally at fault, and the trust would effectively pay the judgment if the trustee was not personally at fault. We have no reason to believe that, in adopting part of the modern approach that benefitted plaintiffs – allowing them to directly reach trust assets by suing a trustee in its fiduciary capacity, irrespective of whether the trustee is personally at fault – the General Assembly intended to retain the traditional approach to the extent it allows plaintiffs to reach a trustee's assets in cases where the trustee is not personally at fault.

The Court of Special Appeals reached the same conclusion, explaining that its "research into the history of ET § 14.5-908 reveals no intentional deviations from the

26

[UTC]." *Hector*, 244 Md. App. at 331. Our own inquiry into the history of § 14.5-908 leads us to the same conclusion.

The official legislative history of ET § 14.5-908 is silent concerning the specific omission of UTC § 1010(b) from the Trust Act. The Act was meant to "partially codif[y] the existing law in Maryland governing trusts, which is based on both case law and statute." Senate Judicial Proceedings Committee, Floor Report, House Bill 83 (2014). Prior to the adoption of the Trust Act, no Maryland court had ever addressed the extent to which, and under what circumstances, a trustee may be held individually liable to a third party for a tort allegedly committed in the administration of a trust. Thus, UTC § 1010(b) did not reflect existing law in Maryland at the time the Trust Act was enacted, and was not codified as such.

However, our review of the available history reflects that the General Assembly did not affirmatively reject § 1010(b). Rather, "[t]he Maryland Association for Justice deleted Section 1010(b) of the UTC" before the legislation was introduced in the 2014 session of the General Assembly. *See* John P. Edgar, *Comparison of Maryland Trust Act to Current Maryland Law and the Uniform Trust Code*, in Maryland State Bar Association, *New Maryland Trust Act*, at 146, Course 5134-14 (Sept. 11, 2014) (MSBA, 2014)[9]; *see also*

---

[9] Mr. Edgar – the reporter for the Section Council of the Estate and Trust Law Section of the Maryland State Bar Association – recounted the drafting process of the Act: "The original drafters of the Act, initially the Section Council of the Estate and Trust Law Section of the Maryland State Bar Association, subsequently joined by the Trust Committee of the Maryland Bankers Association ... used the UTC as a model. The Department of Legislative Services made stylistic changes in the bill drafting process.... The Maryland Association for Justice made further changes. Finally, the House Judiciary

27

H.B. 83, 2014 Leg., 434th Sess., First Reading (Jan. 8, 2014) at 84, (Md. 2014), available at https://mgaleg.maryland.gov/2014RS/bills/hb/hb0083f.pdf [https://perma.cc/Y5GN-QAEK] (first reader of the House Bill that became the Maryland Trust Act, which did not include UTC § 1010(b)). The General Assembly neither added to, nor subtracted from, the version of UTC § 1010 that was introduced as part of the proposed legislation in the House of Delegates and the Senate. In short, we see no indication that the General Assembly, despite incorporating UTC § 1010(a) into the Trust Act, intended to retain the traditional approach under which a plaintiff could recover against a trustee in its individual capacity in cases where the trustee is not personally at fault.

Notably, the Trust Act provides: "The common law of trusts and principles of equity supplement this title, except to the extent modified by this title or another statute of this State." ET § 14.5-106. We find it eminently equitable that, following the enactment of ET § 14.5-908(b), a trustee should be individually liable for a tort only where the trustee is personally at fault. This is consistent with general concepts of tort law that require a finding of fault before a plaintiff may reach a tortfeasor's assets. *See, e.g.*, Stuart M. Speiser et al., 1 American Law of Torts § 1:38 (March 2021 Update) ("The theory that fault is the basis of tort liability is closely allied with the notion of liability premised on concepts of morality.").

Moreover, a plaintiff's ability under the Trust Act to reach the trust's assets directly where the trustee is not personally at fault militates against a rule that allows a plaintiff

---

Committee and the Senate Judicial Proceedings Committee made further changes." *Id.* at 105.

also to reach the trustee's assets where the trustee is not personally at fault. If a trustee could be held personally liable where the trustee is not personally at fault, the beneficiaries of a trust arguably could seek indemnification from a trustee after a judgment was entered against the trustee in its fiduciary capacity, regardless of the trustee's fault. Such a result would expand a trustee's personal liability beyond what it was at common law. *See Hastings v. PNC Bank, NA*, 429 Md. 5, 46-47 (2012) (Adkins, J., dissenting) (observing that, at common law, a trustee's right to indemnification for tort liability was limited, but that such indemnification was available if the trustee "was not personally at fault in incurring the liability") (quoting Restatement (Second) of Trusts § 247). With no indication that the General Assembly, in adopting the Trust Act, intended to expand the liability of trustees in Maryland beyond what it was at common law, we are reluctant to do so here.

In addition, the legislative history accompanying the Trust Act states that "courts may look to the Restatement of the Law of Trusts or case law in other jurisdictions where Maryland statutory or case law does not resolve the issue." Senate Judicial Proceedings Committee, Floor Report, House Bill 83 (2014). Here, where the Trust Act does not provide an explicit answer, and where no prior Maryland appellate court has addressed the question, we turn to the Third Restatement. As discussed above, § 106 of the Restatement (similar to UTC § 1010(b)) "states a related substantive rule," Restatement (Third) of Trusts, § 105 cmt. a, to the rule set forth in § 105 that allows a plaintiff to sue the trustee in its representative capacity, regardless of the trustee's fault: "A trustee is personally liable ... for a tort committed in the course of trust administration, or for an obligation arising from the trustee's ownership or control of property, only if the trustee is personally at

29

fault." Restatement (Third) of Trusts, § 106. These two rules undergird the modern approach to trustee liability to third parties. The General Assembly has explicitly adopted the first part of this modern approach. In our view, it makes no sense to adopt one part without the other. The parties have not pointed us to any other jurisdiction where, by statute or through case law, one of the two parts of the modern approach to trustee liability has been adopted without the other. Thus, despite the General Assembly's omission of UTC § 1010(b) from the Trust Act – which, as discussed above, we doubt was intentional – we adopt the rule set forth in § 1010(b) (also contained in § 106 of the Third Restatement of Trusts) as part of the common law of Maryland. *See Goldstein v. State*, 339 Md. 563, 570 (1995) ("[T]he mere fact that the General Assembly has declined to adopt a particular proposal does not preclude this Court from incorporating the substance of that proposal into the common law or our interpretation of a statute.").[10]

Finally, we perceive a compelling policy underlying our resolution of this question, namely, the likely discouragement of persons and entities to take on the duties and obligations of trusteeship if – after the enactment of ET § 14.5-908(b) – we were to hold that a trustee may be individually liable for torts committed in the course of trust administration where the trustee is not personally at fault.

For the reasons discussed above, we hold that, under Maryland common law, in order for a trustee to be individually liable for a tort committed in the course of trust administration, the trustee must be personally at fault.

---

[10] Of course, if the General Assembly disagrees with our analysis, it may take appropriate legislative action.

30

*A Trustee May Be Personally at Fault If It Fails to Comply with a Duty Imposed on It by Statute or Ordinance.*

Our determination that a trustee must be personally at fault in order to be found individually liable for a tort committed in the course of trust administration begs the next question in this case: where a tort plaintiff seeks to hold a trustee "owner" of property subject to the Housing Code individually liable for a tort, what showing must the plaintiff make to survive summary judgment as to whether a trustee is personally at fault? Relying on this Court's opinion in *Allen v. Dackman*, the Court of Special Appeals held that, in order to prove that a trustee is "personally at fault," a plaintiff must show that the trustee "personally committed, inspired, or participated" in the tort. *Hector*, 244 Md. App. at 341. BNYM asks us to adopt the intermediate appellate court's analysis.

In *Dackman*, the plaintiffs alleged that they suffered injuries caused by lead paint exposure while living at a Baltimore City property owned by Hard Assets, LLC ("Hard Assets"). *Dackman*, 413 Md. at 135. We examined whether Mr. Dackman, as one of the two members of Hard Assets, could be held individually liable for the plaintiffs' injuries. First, we concluded that the trier of fact could find that Mr. Dackman was an "owner" of the Property within the meaning of the Housing Code. Observing that the Housing Code defines an "owner" as "any person, firm, corporation, guardian, conservator, receiver, trustee, executor, or other judicial officer who ... owns, holds, or controls the whole or any part of the ... title" to a property, we focused in *Dackman* on the word "controls." Mr. Dackman did not "own" or "hold" the title to the property – Hard Assets was the owner and holder of the title – but we concluded that the trier of fact could find that Mr. Dackman

31

"controlled" the property because he "had the ability to change or affect the title to the property." *Id.* at 149 (internal quotation marks omitted). Mr. Dackman testified in his deposition that he was responsible for running the day-to-day affairs of Hard Assets during the time period when Hard Assets both acquired and sold the property at issue. He also executed the deed certification when Hard Assets acquired the property, signed a complaint seeking to remove the occupants from the property, and signed the deed when Hard Assets sold the property. *Id.* We explained that these facts were sufficient evidence for a jury to find that Mr. Dackman may have changed or affected the title, or at least had the ability to do so. *See id.* at 149-50.

Although there were facts from which the jury could find that Mr. Dackman was an "owner" of the Property, the Court's inquiry did not end there. Mr. Dackman argued that, regardless of his status as an "owner" under the Housing Code, he could not be held personally liable because his only involvement with the property was through Hard Assets, the entity that owned the property. *Id.* at 152. We rejected the contention that "this necessarily shield[ed] him from liability under the facts of this case." *Id.* Rather, we analyzed cases discussing tort liability for corporate officers and agents, and observed that such an officer or agent "may be liable ... for torts he or she personally commits, or which he or she inspires or participates in, even though performed in the name of an artificial body." *Id.* at 153 (cleaned up). We concluded that this principle applied to members of a limited liability company. *Id.* Important to this conclusion was a provision in Maryland's Limited Liability Company Act which provides that "no member [of a limited liability company] shall be personally liable for the obligations of the limited liability company,

32

whether arising in contract, tort or otherwise, solely by reason of being a member of the limited liability company." Md. Code Ann., Corps. & Ass'ns § 4A-301 (1999). Thus, we observed that "[a]n LLC member is liable for torts he or she personally commits, inspires, or participates in because he or she personally committed a wrong, not 'solely' because he or she is a member of the LLC." *Dackman*, 413 Md. at 154.

We then returned to the summary judgment record in the case, and concluded that a reasonable jury could find Mr. Dackman personally liable because he managed Hard Assets' day-to-day affairs during the period that Hard Assets owned the property; there was no evidence that anyone else managed those affairs during that time; and because those facts were "sufficient evidence for the trier of fact to find that [Mr. Dackman] personally committed, inspired, or participated in Hard Assets' decisions regarding maintenance of the property. For example, [Mr. Dackman] may have personally directed someone else to inspect or maintain the property, [Mr. Dackman] may have directed someone else not to inspect or maintain the property. [Mr. Dackman] also may have chosen not to direct anyone to inspect or maintain the property." *Id.* at 155.

In a footnote, the Court discussed a Court of Special Appeals case, *Shipley v. Perlberg*, 140 Md. App. 257 (2001). *Dackman*, 413 Md. at 150-51 n.13. In *Perlberg*, the Court of Special Appeals also considered "whether a corporate officer and director [was] individually liable for lead paint injuries to the resident of a corporately owned property" as an owner under the Housing Code. *Perlberg*, 140 Md. App. at 261. The intermediate appellate court concluded that Mr. Perlberg, who was an officer of Barbara Realty, the corporation that owned the title to the subject property, was not an "owner" of the property

33

under the Housing Code. The Court of Special Appeals found significant that Barbara Realty, not Mr. Perlberg, owned the property, and that there was "no evidence that Perlberg had title to the subject property or exercised ownership in the manner contemplated by the Code." *Id.* at 277.

The *Dackman* Court disapproved of this holding by the Court of Special Appeals, explaining that, in order to be an "owner" of the property, Mr. Perlberg did not need to have title to the property. The Court noted that "there was evidence that Perlberg was involved with the buying and selling of [the] property" at issue, *Dackman*, 413 Md. at 150 n.13, which meant that Mr. Perlberg controlled the title to the building and therefore was an "owner" within the meaning of the Housing Code. *Id.*

Although disagreeing with the conclusion that Mr. Perlberg was not an "owner" under the Housing Code, the *Dackman* Court concurred with the intermediate appellate court's determination that Mr. Perlberg could not be held individually liable for the alleged torts, where the uncontradicted evidence showed that Mr. Perlberg was not responsible for managing properties owned by Barbara Realty and "had no direct involvement" with the property in question. *Id.* at 151 n.13 (quoting *Shipley*, 140 Md. App. at 262). We thus explained: "Perlberg may have been an 'owner' under the Housing Code, but he could not have been held personally liable for the alleged violations of the Code.... [A] corporate officer is not liable for torts committed by the corporation unless he personally committed, inspired, or participated in those torts." *Id.*

In this case, relying upon *Dackman* (including *Dackman*'s footnote concerning *Shipley*), the intermediate appellate court held that, in order to be "personally at fault" for

34

the alleged negligence that resulted in the Hectors' damages, BNYM as Trustee must have "personally committed, inspired, or participated" in the alleged tort. *Hector*, 244 Md. App. at 341. We disagree with the Court of Special Appeals' application of *Dackman* and *Shipley* to this case.

Mr. Dackman and Mr. Perlberg were "owners" of the properties at issue in their cases because they controlled the titles of the properties owned by artificial entities; *i.e.*, they had the ability to buy or sell the properties, or otherwise affect title. Thus, *Dackman* and *Perlberg* stand for the proposition that, when a corporate officer or LLC member is an "owner" by virtue of their *ability* to control the title as a result of their corporate powers, a plaintiff must show that the defendant personally committed, inspired, or participated in the tort; *i.e.*, that the defendant actually *used* their corporate powers to bring about the commission of the tort.

A different analysis would have applied if, instead of the artificial entities owning the titles in *Dackman* and *Perlberg*, the individual defendants had been the title owners. If that had been the case, this Court would not have needed to consider whether the defendants personally committed, inspired, or participated in the tort, because they *personally* would have owed the duty to maintain the properties that they owned. There is no question that, in such a hypothetical situation involving an individual who owns the title to a property, the Statute or Ordinance Rule would allow the plaintiff's claim against an individual defendant to go to the jury, because the individual personally owed a duty to the plaintiff by virtue of owning the title to the property. At the trial in such a case, the defendant (if they were so inclined) would be able to introduce evidence and argue that their actions

35

were reasonable. However, that individual title owner would not be entitled to summary judgment on the ground that there was no evidence they had knowledge of the statutory violation and, therefore, they could not have personally committed, inspired, or participated in the tort.

Thus, with respect to the *Perlberg* case, if Barbara Realty – the title owner of the property at issue – had been a defendant in that case, it presumably would not have been entitled to summary judgment (unlike its officer, Mr. Perlberg). The Housing Code placed the duty to maintain the property directly on Barbara Realty as an entity that had a direct interest in the property. The Statute or Ordinance Rule would have allowed a claim of negligence against Barbara Realty to go to the jury without any showing that Barbara Realty "personally committed, inspired, or participated" in the alleged tort. Similarly, in *Dackman*, if Mr. Dackman had not been sufficiently involved in the management of Hard Assets to have personally committed, inspired, or participated in the alleged tort, although he might have properly obtained summary judgment, the negligence claim against Hard Assets would have gone to trial.

BNYM – as an "owner" of the Property by virtue of its direct interest in the Property – is analogous to Hard Assets and Barbara Realty. It is not analogous to Mr. Perlberg and Mr. Dackman.

Nevertheless, pointing to Mr. Burnaman's affidavit in support of its summary judgment motion, BNYM emphasizes that, under the PSA, it had only a "passive" role with respect to the mortgages that were part of the Trust's assets. According to BNYM, it was Indymac's responsibility to manage any properties that were purchased in the name of

BNYM as Trustee. Thus, BNYM argues, it cannot be personally at fault for Indymac's failure to properly fulfill the Master Servicer's duties under the terms of the PSA.

The Court of Special Appeals agreed with BNYM that, in order to survive summary judgment, the Hectors needed to produce facts to contradict the affidavit submitted by Mr. Burnaman. *See Hector*, 244 Md. App. at 341-42.[11] However, the Housing Code places a duty personally on a trustee to comply with the statutory requirements of an "owner." *See* Housing Code § 105(jj) (including a "trustee" among the other individuals and entities who may qualify as an "owner"). If Indymac as the servicer was negligent in the performance of its duties under the PSA, BNYM perhaps would have a remedy against another entity, to the extent any entity became responsible for such a liability following Indymac's demise.[12] Regardless, the Housing Code put BNYM on notice before it became the Trustee

---

[11] Even if we agreed with BNYM's argument that the Hectors were required to produce facts showing that BNYM as Trustee "personally committed, inspired, or participated" in the tortious conduct, we would reject its contention that there is no evidence in the record rebutting Mr. Burnaman's affidavit. Viewing the evidence in the record in the light most favorable to the Hectors, they produced facts contradicting Mr. Burnaman's assertion that "BNYM as Trustee's only involvement with trust property was passive." *Hector*, 244 Md. App. at 339 (internal quotation marks omitted). In his deposition, Mr. Hector described two separate encounters with different individuals identifying themselves as representatives of "the bank." With respect to one of the interactions, Mr. Hector testified that the person was a representative of the bank "that foreclosed the property" and said he thought the person was from "New York Bank." On the other occasion, a different representative of "the bank" came to the Property and informed Mr. Hector that: (1) the bank "actually owned the [P]roperty"; (2) the "house was foreclosed on"; (3) no one was supposed to be in the Property; (4) the bank had tried to turn the water off but could not do so because the Property was occupied; and (5) the bank was going to file for an eviction.

[12] Indymac failed during the 2008 financial crisis. *See Lender CIT To Buy OneWest Bank, Formerly IndyMac, for $3.4 billion*, L.A. Times, July 22, 2014 [https://perma.cc/WS2P-VD35].

(and before it became an "owner" of the Property as Trustee) that a trustee "owner" of a covered property has the same duty to maintain the property as any other "owner" that has a direct interest in such a property. The Housing Code does not permit any such "owner" to absolve itself of its obligations under the Housing Code by delegating its duties to a third party.

In sum, we see no reason to create an exception to the application of the Statute or Ordinance Rule where the defendant is a trustee. Where a trustee is an "owner" of a property subject to the Housing Code by virtue of its direct interest in the property, it is treated the same as an individual, corporation, or any other person or entity that has a similar direct interest in a property. Thus, after BNYM became an "owner" by virtue of its direct interest in the Property, it was personally under a statutory duty to maintain it, including keeping it free of a lead paint hazard. To the extent BNYM became an "owner" of the Property while the Hectors resided there, the Hectors needed only to produce facts showing a violation of the Housing Code during that time, and that the violation proximately caused their injuries, in order for their claim against BNYM in its individual capacity to go to the jury. *See Brooks*, 378 Md. at 79. BNYM does not contend that the Hectors failed to make such a showing. Thus, the only question left for us to decide is whether BNYM became an "owner" of the Property before the Hectors moved out.

2. BNYM Became an "Owner" of the Property While the Hectors Lived There.

BNYM contends that the earliest date it became an "owner" of the Property was on August 15, 2002, when the Circuit Court for Baltimore City granted its motion for

38

possession of the Property. It is undisputed that the Hectors had moved out of the Property by that date.

The Hectors argue that BNYM was an "owner" of the Property while they resided there, because BNYM owned, held, and/or controlled the leasehold title to the Property prior to the spring of 2002. At oral argument, counsel for the Hectors asserted that BNYM was an "owner" of the Property as of November 26, 2001, when it caused the foreclosure action to be docketed in the circuit court.

Resolution of this question requires us to construe the Housing Code's definition of "owner." As we have often said, "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the actual intent of the [legislative body] in enacting the law under consideration." *Matter of Collins*, 468 Md. 672, 689 (2020). A court's "primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Lockshin v. Semsker*, 412 Md. 257, 274-75 (2010). If the statutory language "is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Id.* at 275. "However, we do not analyze statutory language in a vacuum." *Matter of Collins*, 468 Md. at 689-90. "Rather, statutory language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 690 (internal quotation marks and citation omitted). We presume that the legislature "intends its enactments to work together as a consistent and harmonious body of law, and, thus, we

seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* (internal quotation marks and citation omitted); *see also Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 302-03 (2001) ("[W]hen interpreting any statute, the statute as a whole must be construed, interpreting each provision of the statute in the context of the entire statutory scheme."). Where statutory language is ambiguous and thus subject to more than one reasonable interpretation, or where the language is unambiguous when read in isolation, but ambiguous when considered in the context of a larger statutory scheme, "a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions." *Lockshin*, 412 Md. at 276 (citations omitted).

We construe local ordinances and charters under the same canons of statutory construction as we apply to statutes. *120 West Fayette Street, LLLP v. Mayor and City Council of Baltimore City*, 413 Md. 309, 331 (2010). The plain language of the local ordinance is the primary source of legislative intent. *O'Connor v. Baltimore County*, 382 Md. 102, 113 (2004). In determining the legislative intent of a local ordinance, we assign the words of the ordinance "their ordinary and natural meaning" and avoid adding or deleting words to impose a meaning inconsistent with the plain language of the measure. *120 West Fayette Street*, 413 Md. at 331 (quoting *O'Connor*, 382 Md. at 113-14). Moreover, "a court must read the language of the charter or ordinance in context and in

40

relation to all of its provisions[.]" *Id.* (quoting *Howard Research Dev. Corp. v. Concerned Citizens for the Columbia Concept,* 297 Md. 357, 364 (1983)).

For convenience, we restate the Housing Code's definition of "owner":

"Owner":

(1) shall mean any person, firm, corporation, guardian, conservator, receiver, trustee, executor, or other judicial officer, who, alone or jointly or severally with others, owns, holds, or controls the whole or any part of the freehold or leasehold title to any dwelling or dwelling unit, with or without accompanying actual possession thereof; and

(2) shall include in addition to the holder of legal title, any vendee in possession thereof, but shall not include a mortgagee or an owner of a reversionary interest under a ground rent lease.

Housing Code § 105(jj).

In its brief, BNYM contends that the first subsection of § 105(jj) "refers to, and is modified by," the second subsection:

Section (1) ... defines "owner" as one who owns, holds, or controls the property. Section (2) ... includes in the definition of "owner," "in addition to the holder of legal title,["] a "vendee in possession" of the property. Section (2) must be read in concert with Section (1). Section (2) modifies Section (1) to make plain that Section 1 refers to the owner as the holder of legal title, and Section (2) adds to the definition of "owner" a "vendee in possession." To ignore the clause "in addition to the holder of legal title," in Section (2) in reading Section (1) would impermissibly render the clause superfluous, in contravention to the rules of statutory construction.... Thus, under the Housing Code, BNYM as Trustee could be deemed an "owner" only when it obtained "legal title" or became a "vendee in possession" of the Property.

We disagree with BNYM's interpretation of § 105(jj) for several reasons. First, BNYM's interpretation of § 105(jj) renders null subsection (1)'s reference to one who "controls" the title to a dwelling or dwelling unit. As we explained in *Dackman*, the City Council intended the term "owner" in the Housing Code "to have a broader meaning than

41

it does in the traditional sense," *Dackman*, 413 Md. at 148, and this expanded meaning includes "not only ... those who actually own the title to a dwelling, but also ... those who hold or control that title as well." *Id.* (cleaned up). If BNYM were correct that only the owner of title as listed in land records, or a vendee in possession of a property, can be an "owner," we would not have held that Mr. Dackman was an "owner" of the property at issue in *Allen v. Dackman*, nor would we have observed that Mr. Perlberg was an "owner" of the property at issue in *Shipley v. Perlberg*. In both of those cases, the individual defendants were not the record owners, or vendees in possession, of the properties. To the contrary, with respect to both Mr. Dackman and Mr. Perlberg, we examined the individuals' control over the titles to the properties in question and found that they were indeed owners, despite the fact that an artificial entity in each instance owned the title.

Second, we do not believe that, in referring to the "holder of legal title" in subsection (2) of § 105(jj), the City Council intended to exempt the purchaser of a property in foreclosure from the definition of "owner" between the date of ratification of the sale and the date of recordation of the purchaser's interest. BNYM's interpretation would permit a purchaser in foreclosure to avoid the obligations of an "owner" under the Housing Code by delaying its taking possession of the property and the recordation of its interest. This could result in no "owner" being responsible for the maintenance of a property while it is still occupied by the prior landlord's tenants, and despite the fact that the purchaser by statute may be the landlord upon ratification of the sale. *See* Md. Code Ann., Real Prop. § 7-105(f)(2) (1996 Repl. Vol., 2002 Supp.) ("RP") (providing that, if the required advertisement of sale so discloses, "a foreclosure sale shall be made subject to one or more

42

of the tenancies entered into subsequent to the recording of the deed of trust" and that "[a]ny lease so continuing is unaffected by the sale, except the purchaser shall become the landlord, as of the date of the sale, on ratification of the sale"). We are confident that the City Council did not intend such a result. Such an interpretation would run afoul of the Housing Code's directive to liberally construe its provisions to further the Code's remedial purposes. *See* Housing Code § 103(b). Those purposes include the establishment and maintenance of minimum standards "essential for the protection of the health, safety, morals, and general welfare of the public and of the owners and occupants of dwellings in the City of Baltimore" and "governing the condition, use, operation, occupancy, and maintenance of dwellings and other structures, and the utilities, facilities, and other physical components, things, and conditions to be supplied to dwellings in order to make dwellings safe, sanitary, and fit for human habitation." *Id.* §§ 103(a)(1) & (a)(2). Both of these purposes are furthered by an interpretation of § 105(jj) that includes within its definition of "owner" an entity that has purchased a property at foreclosure and whose purchase has been ratified by the circuit court.[13]

Third, under the Real Property Article, ratification of the foreclosure sale operates to pass all the title that the borrower had in the property at the time the deed of trust was recorded that reflected their indebtedness. *See* RP § 7-105(a) (1996 Repl. Vol., 2002 Supp.)

---

[13] We read the phrase "shall include in addition to the holder of legal title, any vendee in possession thereof" in § 105(jj)(2), as applied to the situation presented here, to mean that, where a purchaser at foreclosure obtains possession of the property prior to ratification of the sale, that purchaser is also an "owner" of the property within the meaning of the Housing Code.

(providing that a foreclosure sale, "after final ratification by the court and grant of the property to the purchaser on payment of the purchase money, has the same effect as if the sale and grant were made under decree between the proper parties in relation to the mortgage or deed of trust and in the usual course of the court, and operates to pass all the title which the borrower had in the property at the time of the recording of the mortgage or deed of trust");[14] *see also IA Constr. Corp. v. Carney*, 341 Md. 703, 711 (1996) ("After the foreclosure sale the purchaser had the equitable interest in the land commensurate with that conveyed by the mortgage deed, and the purchaser was entitled to the legal title upon the final ratification of the sale by the court and the payment of the purchase money.") (cleaned up).

In this case, it is undisputed that, prior to the foreclosure sale, Ms. Epps-Smith was an "owner" of the Property within the meaning of the Housing Code based on her leasehold interest. It follows that BNYM was an "owner" of the Property, at the latest, on February 5, 2002, based on its acquisition of that same leasehold interest upon the ratification of the foreclosure sale.

However, contrary to the Hectors' position, we decline to interpret § 105(jj) to include the mortgagee/beneficiary of a deed of trust as an "owner" at the moment it causes a foreclosure action to be docketed. Notably, subsection (2) of § 105(jj) provides that "a mortgagee or an owner of a reversionary interest under a ground rent lease" is not an "owner" for purposes of the Housing Code. In *Dyer v. Otis Warren Real Estate Company*,

---

[14] This provision is currently set forth at RP § 7-105(c).

371 Md. 576 (2002), we observed that a mortgagee under Maryland law is generally considered "the owner of the property even if equity does for certain purposes treat him as merely having a lien on the land." *Id.* at 583 (internal quotation marks and citation omitted). There, however, interpreting the substantially similar definition of "owner" in the Lead Poisoning Prevention Act, Md. Code, Envir. § 6-801(o) (1974, 1996 Repl. Vol., 2000 Cum. Supp.), we explained that the exclusion of a mortgagee (and the owner of a reversionary interest under a ground rent lease) from the definition of "owner" "is a restriction on the definition of ownership, excluding interests in real property that, in the past and in other contexts, were classified by this Court as 'ownership.' Clearly, aware that these classes of persons have been classified as 'owners' in the past, the Legislature did not want to expose them to liability even though they own, hold or control the property." *Id.* at 583-84. The same is true with respect to the Housing Code by virtue of its specific exemption of a mortgagee from the definition of "owner."

After Ms. Epps-Smith's mortgage became a part of and owned by the Trust, BNYM became the equivalent of a mortgagee. It retained that status until the date of the foreclosure sale (December 27, 2001). Prior to that date, Ms. Epps-Smith had the ability to cure her default. *See, e.g.*, Md. Rule 14-209(b)(1) (2001) (providing, among other things, that a debtor may file a motion for an injunction to stay a foreclosure sale along with an affidavit showing that the "debt and all interest due thereon have been fully paid"); *see also Greenbriar Condominium, Phase I Council of Unit Owners, Inc. v. Brooks*, 387 Md. 683, 740-41 (2005) (explaining that, prior to the foreclosure sale, the debtor had the right to file a motion to enjoin the sale under Rule 14-209, but that after the sale went forward, an

45

injunction was not permissible to overturn the sale, nor were exceptions to the sale filed under Maryland Rule 14-304 appropriate to "upset retroactively a sale properly held"), *superseded by Rule as stated in Thomas v. Nadel*, 427 Md. 441, 444 n.5 (2012). In our view, this means that BNYM was not an "owner" of the Property within the meaning of the Housing Code prior to the foreclosure sale.[15]

The only remaining question we must decide is whether BNYM became an "owner" of the Property as of the date of the foreclosure sale (December 27, 2001), or as of the date of ratification of the sale (February 5, 2002). We hold that BNYM became an "owner" as of the date of the foreclosure sale. This is the case because, under the Epps-Smith deed of trust, the mortgagee/beneficiary had the right to possession of the Property prior to ratification of the foreclosure sale.

In *Empire Properties, LLC v. Hardy*, 386 Md. 628 (2005), we alluded to this very situation. There, we explained that, generally, a purchaser at foreclosure was not entitled to possession of the property until after the sale was ratified by the circuit court. *See id.* at 650-51. However, we recognized that, in some cases, "sufficient reasons" may exist to permit a purchaser to take possession of the property before ratification. One such reason

---

[15] The Hectors argue that BNYM was a "vendee in possession" of the Property – and therefore an "owner" – prior to the foreclosure sale because Ms. Epps-Smith's deed of trust stated that the Borrower "shall have possession of the Property until Lender has given Borrower notice of default." Although (as discussed below) this provision of the deed of trust is relevant to the determination whether BNYM became an "owner" of the Property on the date of the foreclosure sale (and not only upon ratification of the sale), it is immaterial to the question whether BNYM was a vendee in possession prior to the foreclosure sale. BNYM was not a "vendee" until it purchased the property at foreclosure. *See Vendee*, Black's Law Dictionary (11th ed. 2019) (defining a "vendee" as "[a] purchaser, usu. of real property; a buyer").

we referenced was where the "deed of trust provides for possession before judicial sale or court ratification, *i.e.*, upon default, etc." *Id.* at 650; *see also id.* at 649 ("[W]here such language is provided in the deed of trust or mortgage, purchasers at foreclosure sales may be contractually entitled to possession prior to ratification of that sale by the court (mortgagees or their assigns may even be entitled to seek possession prior to the sale itself if the instruments so provide).").

Here, the deed of trust provided that Ms. Epps-Smith, as the Borrower, "shall have possession of the Property until Lender has given Borrower notice of default." Thus, BNYM was not required to wait until ratification of the sale to seek a court order for possession of the Property. It is exceedingly unlikely that, after the date of the foreclosure sale, Ms. Epps-Smith or Mr. Smith would take any further action to maintain the Property pending ratification of the sale. That being the case, and consistent with the remedial purposes of the Housing Code, we conclude that BNYM as Trustee became an "owner" of the Property as of the date of the foreclosure sale on December 27, 2001.

It is undisputed that the Hectors were still living at the Property on December 27, 2001. BNYM owed the Hectors a duty under the Housing Code beginning on that date. Accordingly, the circuit court erred in granting summary judgment to BNYM.

# IV

## Conclusion

The Hectors may sue BNYM in its individual capacity for a tort committed in the course of trust administration. To prevail at trial, the Hectors must show that BNYM was personally at fault. We affirm the Court of Special Appeals on these two points.

Because BNYM was an "owner" under the Housing Code by virtue of its direct interest in the Property, the Hectors were not required to produce facts showing that BNYM as Trustee "personally committed, inspired, or participated" in the alleged tort. Rather, in keeping with the Statute or Ordinance Rule, the Hectors produced sufficient facts to show that a violation of the Housing Code proximately caused the alleged harm. This is sufficient to allow the Hectors' claim against BNYM in its individual capacity to go to the jury, provided that BNYM became an "owner" while the Hectors resided at the Property.

A purchaser of property at foreclosure generally became an "owner" of the property within the meaning of the Housing Code upon ratification of the foreclosure sale. Because BNYM – as the beneficiary of Ms. Epps-Smith's deed of trust – had the right to seek possession of the Property prior to the ratification of the foreclosure sale, it became an "owner" of the Property once it purchased the property at the foreclosure. Prior to the foreclosure sale, BNYM was a mortgagee and, therefore, not an "owner" of the Property.

For the above reasons, the circuit court erred in granting summary judgment to BNYM and then dismissing the Second Amended Complaint as to BNYM in its individual

capacity. Accordingly, we remand this case for further proceedings consistent with this

opinion.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/10a20cn.pdf